Madam Clerk, please call the first case. 1-12-408 Madeline Stidwell v. Washington Inventories Counsel Good morning. This is George Gaines for the injured worker, Dionne Stidwell. I'll give you a brief recitation of the facts. This is a 35-year-old data entry clerk who experienced carpal tunnel syndrome beginning in April of 2004. She started treating and losing time from work as a result of that. About six months later, she was fired for these reasons, the treatment and losing time from work. Symptoms did not abate after her discharge. The employer's doctor agreed that she needed surgery. The employer paid for the related surgery to the hand. And the resulting lost time post-op, if you will. But the symptoms still persisted. She tried working and couldn't perform it. She eventually visited Dr. Daniel Mass at my suggestion to find out what was going on. And he found a complication from the surgery as the reason for her ongoing disability. And he ordered a surgical revision. He also found physical restrictions that were permanent and which allowed for only one-handed use. One-handed work, excuse me. Basically no use of the injured right hand. A voc rehab counselor who I sent the worker to found that she was unlikely to be employed on a regular basis as a result of this condition. At arbitration, the arbitrator found no causal connection, which must have been a typo. I don't know. Because he did award temporary total disability benefits surrounding the surgery and the recovery therefrom. And also a 17.5% loss of use of the right hand. But he denied some of the medical bills, which are no longer an issue. And also denied her claim for prospective medical care, the surgery that Dr. Mass had recommended. He denied those things wrongly, as the commission found. They found causal connection and entitlement to that prospective care, the surgical revision. So you're basically taking issue with the commission's permanency decision, correct? And their temporary total disability denial. With regard to the permanency decision, I know you're citing Dr. Mass in support of the claimant's position. But didn't, following the initial surgery, didn't Mass recommend a surgery to release the nerves, and opined that the surgery would provide her with claimants with enough relief to return to work. And he said it had an 83% success rate. He said her condition would require permanent restrictions, quote-unquote, if she did not receive further medical care for her condition. So wasn't his opinion conditioned on the further surgery? I'm sorry, wasn't his opinion? His opinion that she would require permanent restrictions is qualified by the assumption that she received no further medical care, including the surgery he recommended. He didn't say she would be permanently disabled under all circumstances, did he? He, well, that's what the commission focused on when they issued their decision. And we find that to be illogical. May I suggest? Dr. Mass, as you stated, Your Honor, based his restrictions, well, I should say, the commission found that Dr. Mass based his restrictions solely on his surgical recommendation. Okay. Well, we fail to see the logic there. Let me explain. The surgical recommendation or medical care is based on the need to cure or relieve the effects of an injury. A condition does not exist only if it's operated on. That's sort of where that logic takes you. Conditions require treatment and or lost time and permanent disability benefits thereafter. But to sort of isolate the significance of these restrictions to the, I'm sorry, to isolate the surgical recommendation to only have an impact on the restrictions for that purpose and not apply those findings to the rest of the case, it doesn't stand to reason. If we're looking at the significance, let's look at the significance of these findings. We contend that they lead to nothing other than permanent total disability. The commission relied on Dr. Mass' opinion over all the other doctors. He found that she had permanent, and he uses that word, limited use of that hand. She was only capable of one-handed work. And, of course, the only vocational rehab opinion of record found that this lady is going to wind up in an odd, odd permanent total. The commission finds that she needs the surgery as well, agreeing with Dr. Mass. That's indicative of a significant disability. And contrary to the commission's opinion, or decision, I should say, the opinions of Dr. Mass and Dr. or Ms. Entenberg add up to the fact that this woman is not regularly employable. He's not, but again, didn't Mass make it clear that if she underwent the surgery he recommended, he said it was very likely she would recover within four to six weeks and be able to resume her former occupation. Didn't he say that? Yeah, he did. But he also said that at that point in time, her condition was permanent. There is no more surgery than what happens. And I guess this lady is permanent as of October 2006. And it is her prerogative whether or not to choose surgery. After all, having already gone through one failed surgery, I guess it would be reasonable for her to choose not to have another one. And there's no evidence of record that she has had another one. She reached MMI on October 2006, is our contention. The Act provides for all of this, is also our argument. I mean, the Act provides for medical care and TTD and permanency collectively, not in the alternative. And the reasonable inference to be drawn here is that regarding permanency, she reached MMI on that date. That's what Dr. Mass found. This was well over a year after her last treatment.  And, okay, well, what happens if she has the surgery and she gets better? The Act provides for that. Okay. Once again, as of October 2006, Dr. Mass finds these very significant restrictions. And the voc rehab evidence comes in confirming that she, unfortunately, is going to be in an odd lot permanent total. If she goes ahead and has the surgery, sure, maybe she'll get better. But ADAPT provides for that. ADAPT provides for if there's some change in the condition, worse or better, that the matter can be reopened. The issue can be addressed. And she could lose her permanent total disability benefits and be relegated to a percentage loss of use of the hand. So by providing for, I think that supports our argument, the fact that the Act provided for that eventuality. But to deny compensation for temporary total disability benefits and permanency, because I think the word that was used was that Ms. Stidwell would consider more medical care, that's not supported by the law. And if you think about the consequences of that, that would, if that were the case, that would only serve to force workers to choose between their medical care and their permanent disability benefits. I don't think that's what the Act intends. There's much discussion regarding the issue of temporary total disability. Interstate Scaffolding and the Cook County case that I cite make very clear the law here. And on these facts, her condition had not stabilized to the extent that she was able to reenter the workforce. That's really the crux of one's entitlement to temporary total disability benefits. She was not there. And I believe it's the Cook County case gets into this issue of, does there have to be a doctor's note? And the answer is no. Now, if you look at the circumstances again of this case, let's recall that she was fired. And you can see where the layman is going to figure, okay, I don't have a job. I've been fired. How am I going to get medical care? Am I going to go to an emergency room? Am I going to rely on the good graces of my family doctor, Dr. Eldewick? That's what she wound up doing. But, you know, when you're unemployed and you've got workers competent in your case, it's not so easy to get medical care. Now, that's where she was forced. And I'd hate to see a decision like this stand where we would have these problems again, where employers, once an employee is fired, finds that they're forced to just settle their case for whatever they can get and not get the medical care that they need and then wind up on the dole. And I think that's why we have the act that we have, to prevent that very thing. The commission used the term, I believe, in the alternative. Now, the alternatives, if any here, aren't between temporary disability benefits, medical care, or permanent disability, because that's not how the act reads. If I use those words at the arbitration hearing, it was to make clear to the arbitrator that he, we anticipated, based on the evidence, would either find that this woman was entitled to temporary disability benefits throughout this entire period. That is nothing to indicate that she recovered from the effects of this injury. And also entitled to the prospect of medical care, if she chose to have it. And as you pointed out, Your Honor, 85%, I believe, is what Dr. Massa said, that those are pretty good odds. Or, and here's the alternative, or find that she's reached a permanent state, which she would have if she never had any more care after that initial surgery, as well as the prospect of medical care. There's nothing in any of the case law or in the act suggesting that you only get one or the other, and if there's permanency, well, now there can't be any more medical care, and oh, Lord, what if she gets better or worse? It's all provided for. And either side could reopen the issue of permanent disability and the extent of it. So I guess I would conclude that you've heard it many times that this is an act to be liberally construed in favor of the worker. It's intended to provide timely lost time benefits where indicated. And it is an act that requires the employer to provide vocational rehabilitation when it's indicated. And I think all these things are indicated here, and we're confident that you'll decide this case with those policies in mind. Thank you, counsel. Do I have time on reply? Counsel? Rebalo? Good morning, Your Honors. Counsel, my name is Andy McCauskas. I represent the respondent, Washington Inventory Services, in this matter. I'd like to start with the permanency issue. While you're in the course of your discussion, how do you respond to counsel's argument on the permanency issue that really is the claimant's prerogative as to whether or not she decides to avail herself of further surgery on this issue? That's up to her. Well, Your Honor, I would say this. First of all, plaintiff requested the prospective medical, the surgery prescribed by their chosen doctor, Dr. Mass. That surgery was awarded. And while in the record today it does not reflect that she's had the surgery, for counsel to imply that it has not taken place is not accurate and is not appropriate. As far as I'm concerned, she's not at MMI until she's recovered from this surgery. We're premature to determine permanency at this point in time when the commission has awarded to the petitioner the future treatment that in all likelihood, according to their own doctor, is going to make her better and is going to get her to a point where she can return to her regular work. So why determine permanency now on the issue of maybe she's had the surgery or maybe she has or has not had it? Let's see when she's done, let's see what her result is, and then let's decide is this a percentage of the hand case or otherwise. There isn't any case law. How long will that take? Dr. Mass said four to six weeks after the surgery. He anticipated that she would be back to full duty. No, I meant for further determination of permanency. Well, that would be something that the commission, once she has reached MMI, the commission would make that determination, the arbitrator commission. There isn't case law supporting counsel's position specific to these facts. He references AF in general, but we've got a clear situation here where they've asked for, they've been awarded future medical. Let's see what the result is of the future medical that was awarded, and then when she's at MMI, determine permanency. That would be our position as far as that issue is concerned. As far as the TTD requested, the finding of the commission was not against the manifest way to the evidence. The petition has a burden to show that she is unable to work in order to collect temporary total disability benefits. That burden has not been met, and there was certainly plenty of evidence to support the commission's decision on the issue of TTD. Let's talk pre-surgery. They've requested it from October of 2004 to May 2005. I need to clear something up in terms of the facts. She started treating with the doctor in April of 2004 for her carpal tunnel. She does not see her doctor again until after she is terminated as far as carpal tunnel is concerned. When she sees the doctor in April of 2004, there is no prescription for physical therapy. There is no work restrictions applied at all, nothing. Now, for the petitioner to come in and say, I was fired because I was missing appointments due to physical therapy. I was missing work due to physical therapy. That's totally not true. Look at the medical records. There's no therapies prescribed. There's no therapy attended until two weeks after she is no longer working for my client, October the 19th of 2004. That's when she starts physical therapy. So to say that she's unable to do her work and that's why she's terminated or she's missing time at work and that's why she's terminated because she's going to physical therapy, that's not supported in the record at all. Those medical records will show she didn't have any of that treatment. And that's just not accurate. She was terminated because she did not bring equipment to a store for a job. Council brought in a coworker whose deposition was taken. This coworker had a lawsuit pending against my client. So I would suggest that there was some bias there. So in terms of before the surgery, it's not until February of 2005 that the petitioner sees Dr. Ficori. Dr. Ficori looks at EMG results, which say mild purple tunnel, and suggests conservative treatment. And if that doesn't work, then surgery. But again, no restrictions. Nobody has put any restriction. Nobody has said this woman is unable to work until she actually goes under the surgery by Dr. Heller in June, at which point TTD is paid. TTD is paid through August 18th of 2005, at which point Dr. Heller says she's got an excellent result. That's the treater. She's got full strength. She's got 76-pound grip on the right, her dominant hand in the hand with the surgery versus 50 on the left. She's got full range of motion. She has an excellent outcome, according to Dr. Heller, discharged from care, full duty. Okay? We then go 13 months before she sees a doctor for treatment for her carpal tunnel. Thirteen months. And then that's Dr. Mass, the attorney chosen by petitioner's counsel. If she really couldn't work during all that time, the 13 months after she's discharged with an excellent result by Dr. Heller, where's the treatment? Where's the doctor saying that she can work? There are no restrictions. There's nothing saying that she can't work during that time. And there's no ‑‑ there's certainly enough evidence for the commission to say, you know what? She's not entitled to TTD for this period either. Because medically, look at that time gap. Look at the results she had in August of 2005. Where's the treatment? Where are the restrictions? There's plenty for the commission to rule as they did. So in conclusion, I would say ruling the permanency at this point is premature. And as far as the TTD claim, the commission had a good factual basis to rule as they did. And they certainly had a decision that was not against the manifest way on these issues. Thank you. Thank you, counsel. Counsel, you may reply. Just briefly, as Your Honor pointed out, yeah, it is the injured worker's prerogative whether or not to have treatment. We can't let that tail wag this dog here with respect to these other issues. And that's what the commission has done and what counsel is arguing for. Well, how do you respond to his argument based on the record he's referring to? Dr. Heller found the claim incapable of full duty on August 18, 2005. No doctor imposed any restrictions during the interval between August 2005 and the claimant's first visit to Dr. Maas on September 11, 2006. Is that not true? That's all true. But look what happens. A year later, it becomes crystal clear, as Dr. Maas and the commission found, agreeing with Dr. Maas, that this surgery needed revision. That either it was not fully performed or the adherence of the nerve preventing movement of her hand occurred after a well-done surgery. He called it a known yet rare complication in 1 percent of cases. So her testimony, which comports with Maas's findings, was that immediately after the surgery, I felt real good. But then very shortly thereafter, I didn't. And it was similar. The symptoms were similar, but they were just still different. It fits perfectly with what Dr. Maas found and what the commission agreed with. So we're saying she should have got TTD based on hindsight, what happened later, not during this period of time with no doctor's notes or medical support for the argument. Well, the condition manifested itself, began to manifest itself immediately after the first surgery. It wasn't explained until we paid for her to go to see Dr. Maas. The company wasn't going to pay for it. And then Maas put it all together. So Heller finds her capable of full duty, releases her in August of 2005. Nothing happens for 13 months, but she's entitled to TTD for that period. Well, when you say nothing happened, if you're referring to medical care. Medical care restrictions or medical support. Right. If you're referring to documented medical treatment and restrictions, you're absolutely correct. But Dr. Maas takes it all the way back, and he finds the origin of the problem that he diagnoses in 2006 requiring this new surgery, okay, to be with the failed surgery of June 16, 2005. So we would suggest that that's enough, that that connects it up. It took a year for all this to kind of become clear, but Dr. Maas connects it all up in the commission agreement. There was some mention made of Mais suggesting that maybe she didn't have the surgery and maybe, I guess the theory would be that if she did have the surgery, then, well, maybe she's better now, and now let's decide. And so the decision was premature, as I think Your Honor pointed out. How long before we decide permanency, I believe, was your question. And, well, that's exactly the problem here. It's supposed to be a speedy resolution. And if people get better or worse or need more treatment or don't need more treatment, it's all provided for in the Act, not to be determined at the convenience of employers. This is the Workers' Compensation Act. So now, so this speculation about the surgery is not a record and is improper. Let's see. Oh, I heard counsel mention that there was no prescription in 2004 after, well, I guess at all in 2004 for surgery and for her tying all this together or what have you. Are we now contesting causal connection? I think the commission found that the respondent was not contesting it. I think their brief, I believe it was on page 13, made that pretty clear. Also, counsel argues that it's totally not true that the petitioner lost time from work as a result of this injury, not if you ask her supervisor, Mary Miles, who testified in this case, testified how she got drummed, the petitioner got drummed out of there because of her losing time from work and wearing her splint to work. And the other boss, his name escapes me, Mr. Washington, no, he fired her for that reason, according to Ms. Miles, who was one of her supervisors at that time. But, you know, I don't think we're going to get too much into terminations here, as we've learned from interstate scaffolding. To the extent that they are supportive of issues of nature and extent and the ability to work, I suppose they're relevant to workers' comp cases. Counsel, your time is up on reply. All right, great. Thank you. Thank you. Thank you, counsel, for your arguments in this matter. It will be taken under advisement. A written disposition will issue.